UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHIRLEY DENISE JOHNSON,

                              Plaintiff,

              v.

NANCY A. BERRYHILL, Commissioner of the
Social Security Administration,

                              Defendant.
_____

DECISION & ORDER

17-CV-6436P

## PRELIMINARY STATEMENT

Plaintiff Shirley Denise Johnson ("Johnson") brings this action pursuant to

Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial

review of a final decision of the Commissioner of Social Security (the "Commissioner") denying

her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case

by a United States magistrate judge.  (Docket # 12).

Currently before the Court is Johnson's motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure (Docket # 9), and the Commissioner's

cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Docket # 11).  For the reasons set forth below, this Court finds that the decision of

the Commissioner is supported by substantial evidence in the record and complies with

applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the

pleadings is granted, and Johnson's motion for summary judgment is denied.

# BACKGROUND

### I.    Procedural Background

Johnson protectively filed for DIB and SSI on April 24, 2014, alleging disability beginning on June 1, 2013, due to osteoarthritis in her right shoulder and right knee, chronic pain in her right calf, right elbow, and lower back, depression, anxiety, and panic attacks. (Tr. 48, 49, 79).[1] On June 24, 2014, the Social Security Administration ("SSA") denied Johnson's claim for benefits, finding that she was not disabled. (Tr. 129-44). Johnson requested and was granted a hearing before Administrative Law Judge David S. Pang (the "ALJ"). (Tr. 99-101). The ALJ conducted a hearing on December 7, 2015. (Tr. 189-215). In a decision dated January 20, 2016, the ALJ found that Johnson was not disabled and was not entitled to benefits. (Tr. 79-98).

On May 15, 2017, the Appeals Council denied Johnson's request for review of the ALJ's decision. (Tr. 1-6). Johnson then commenced this action on July 6, 2017, seeking review of the Commissioner's decision. (Docket # 1).

### II.    Relevant Medical Evidence[2]

### A.    Treatment Records

### 1.    Behavioral Health Network

On February 20, 2014, Johnson underwent a psychosocial assessment with Kerry Bauer ("Bauer"), LMSW, a licensed social worker, at the Behavioral Health Network's program

---

[1] The administrative transcript shall be referred to as "Tr. __."

[2] Those portions of the treatment records that are relevant to this decision are recounted herein. Johnson does not argue that the ALJ erred in his evaluation of her physical limitations; thus, the summary of relevant records pertains only to Johnson's mental limitations and substance use issues.

at the Rochester Mental Health Center ("RMHC").  (Tr. 347).  Johnson presented for mental

health treatment in order to attempt to determine "what [was] going on in [her] head."  (*Id.*).

Bauer noted that Johnson presented as tearful during intake and felt that she was

being stalked.  (*Id.*).  Johnson reported that she had tried to hurt herself in the past, but denied

any current suicidal ideation.  (*Id.*).  Johnson did not remember information concerning many of

the issues reviewed in Bauer's intake assessment.  (*Id.*).  Johnson indicated that she suffered

from substance abuse, "mostly alcohol, marijuana, and crack/cocaine."  (*Id.*).  Johnson told

Bauer that she had not smoked crack since August [2013], but that she used alcohol and

marijuana regularly.  (*Id.*).  Johnson identified drinking to be her "main issue," but also endorsed

polysubstance dependence.  (Tr. 348).  She also reported that she went to bars and church for

social activity. (Tr. 347).  Bauer referred Johnson to the Drug and Alcohol Problem ("DAP")

program for intake.  (*Id.*).

Bauer noted that Johnson appeared well-groomed, and was cooperative, yet

guarded.  (Tr. 348).  Johnson's eye contact was good, her behavior was appropriate, and her

motor activity was calm.  (*Id.*).  Her thought-process was logical, and she was goal-oriented and

had negative ruminations.  (*Id.*).  Johnson was not experiencing hallucinations, her affect and

judgment were appropriate, her insight was good, yet her mood was depressed.  (*Id.*).  She was

also oriented to person, place, and time.  (Tr. 349).  Bauer identified chemical dependency

among her risk factors.  (*Id.*).

Johnson met with Bauer again on March 10, 2014.  (Tr. 356).  Johnson reported

that since her last appointment she had experienced reduced depression and anxiety.  (*Id.*).

Johnson indicated that she had been sober for several days and was continuing her treatment

programs at RMHC, including DAP and outpatient mental health.  (*Id.*).  Johnson also reported

that she was using television and crossword puzzles "as good distractions from depression rather than the use of alcohol." (*Id.*).

On March 18, 2014, Johnson reported to Bauer that she was continuing to experience reduced depression and anxiety. (Tr. 355). Johnson reported that she had started a relationship with someone who was a recovering alcoholic, which was a "positive social support," and that she hoped to attend AA meetings with him. (*Id.*).

Johnson met with Bauer again on April 14, 2014. (Tr. 353). Johnson again reported a reduction in depression and anxiety. (*Id.*). Johnson processed thoughts and feelings about her substance use and indicated that she had been using the YMCA "to work out and keep from using alcohol and drugs." (*Id.*). On April 28, 2014, Johnson indicated that she was continuing to experience a lessening of her depression and anxiety. (Tr. 352). Johnson told Bauer that she needed to change "her social circle" and that AA meetings "might help her do this." (*Id.*). Bauer noted that Johnson "appear[ed] able to identify the correlations between actions and results in achieving [her] goals." (*Id.*). Throughout Johnson's meetings with Bauer, her mental status remained largely the same. (Tr. 348-49, 352-53, 355-58).

On October 3, 2014, Johnson presented to Wade Turnipseed ("Turnipseed"), MS, MFT, at RMHC "in the hopes of getting linked with DAP again." (Tr. 425). In his pre-admission screening of Johnson, Turnipseed noted that Johnson was 51 years old and unemployed. (*Id.*). Johnson reported that she had been using cannabis and alcohol "for a long time now." (*Id.*). She reported symptoms of depression and anxiety. (Tr. 425-27). Regarding her mental status exam, Johnson appeared well-groomed, guarded in her attitude, and made fair eye contact. (*Id.*). Her behavior and speech were appropriate, and her motor activity was appropriate, but agitated. (*Id.*). Johnson had logical thought-process, but was preoccupied and

had negative ruminations.  (*Id.*).  She had flat affect, was depressed, and had poor insight.  (*Id.*).  Her judgment was appropriate, and her memory and orientation were intact.  (*Id.*).  Turnipseed referred Johnson to DAP.  (Tr. 427).

Johnson was readmitted to RMHC for mental health treatment on January 21, 2015.  (Tr. 411).  In his psychosocial assessment/admission note, Turnipseed indicated that Johnson presented with symptoms of depression and anxiety.  (*Id.*).  Johnson's goal was to be able to "adapt and function in society, and . . . to get past her depression."  (*Id.*).  Johnson reported that she had consumed alcohol several days earlier and admitted that she was a "different person" when she drank.  (Tr. 412).  She indicated that she was "confined" to herself when she was sober.  (*Id.*).

Turnipseed noted that Johnson presented as tearful and guarded, alert and oriented, with flat affect, normal thought content, and logical thought-process.  (*Id.*).  Turnipseed's clinical/diagnostic summary concluded that Johnson had a significant history of depression and anxiety "contributing to and/or exacerbated by her current pattern of alcohol dependence."  (Tr. 414).  Turnipseed opined that the "course and severity of [Johnson's] symptoms [were] congruent with a diagnosis of Dysthymic Disorder and Alcohol Dependence[, and that] further assessment should be used to rule out other mood and possible anxiety disorders."  (*Id.*).

Turnipseed saw Johnson again on February 5, 2015.  (Tr. 422).  Johnson reported a recent relapse, and Turnipseed discussed the "importance of sober social supports."  (*Id.*).  Johnson presented with a guarded attitude and constricted affect.  (*Id.*).

On March 3, 2015, Johnson reported to Turnipseed that she had "maintained abstinence" and was feeling "like she was ready to be better."  (Tr. 421).  Turnipseed noted that

Johnson was "noticeably happy today, as opposed to tearful and guarded at previous sessions." (*Id.*). Johnson also reported that she had been attending AA meetings. (*Id.*). Johnson's attitude was cooperative, her affect was appropriate, and her insight was good. (*Id.*).

On April 2, 2015, Johnson again reported to Turnipseed that she had "maintained abstinence" and was "feeling good and on a natural high." (Tr. 420). Turnipseed noted that Johnson appeared "noticeably happy." (*Id.*). Johnson noted that her "faith and strength and having a strong recovery network at [RMHC] ha[d] helped her get this far." (*Id.*). Johnson was again cooperative, had appropriate affect, and had good insight. (*Id.*). Turnipseed marked Johnson's imminent risk factors as "low" – an improvement from the "moderate" assessment he noted in his prior two visits with her. (*Id.*).

On April 28, 2015, Johnson reported that she had relapsed on April 14, 2015. (Tr. 416). Johnson reported feeling "up and down, feeling happy one day and tearful the next." (*Id.*). At a June 25, 2015 meeting, Johnson reported to Turnipseed that she had relapsed on June 7, 2015. (Tr. 415). On July 9, 2015, Johnson presented as tearful and with anxiety and depression, but no note was made about any substance use. (Tr. 453). Turnipseed noted that Johnson's mental status was euthymic. (*Id.*). On August 13, 2015, Johnson reported that she had run out of her medications; again, no note was made about any substance use. (Tr. 452). Turnipseed characterized Johnson's mental status as euthymic. (*Id.*). At an August 24, 2015 meeting, Johnson reported that her depression had decreased since restarting her medications, but that she had drunk alcohol on August 21, 2015 and had been in distress over a recent death in her family. (Tr. 451). Turnipseed noted that Johnson's mood was depressed. (*Id.*).

On September 24, 2015, Johnson reported a relapse on September 21, 2015. (Tr. 450). She indicated that she experienced increased nightmares, flashbacks, hypersomnia,

and suicidal ideation without means, plans, or intent. (*Id.*). Johnson reported that she was "afraid to be sober, because of these painful symptoms that [she] d[id] not understand how to deal with." (*Id.*). Turnipseed noted that Johnson's mood was again depressed. (*Id.*). Johnson presented in a similar manner on October 26, 2015. (Tr. 449). No recent relapses were noted, but Johnson reiterated her fear of being sober and reported increased nightmares and flashbacks, hypersomnia, and suicidal ideation without means, plan, or intent. (*Id.*). Turnipseed noted that Johnson's mood was depressed. (*Id.*).

## 2. <u>Andrew Wolff, MD</u>

At the Commissioner's request, on June 13, 2014, Johnson's primary care physician, Andrew Wolff ("Wolff"), MD, completed a medical questionnaire about Johnson's impairments. (Tr. 372-79). Wolff indicated that he first started treating Johnson on April 4, 2014, and that her treating diagnoses included depression that apparently worsened following an assault in 2013. (Tr. 373, 375). Johnson's symptoms included depressed mood (Tr. 373), which was being treated with medicine and therapy sessions, and Wolff indicated that Johnson had a psychiatric appointment pending (Tr. 375).

Regarding Johnson's mental status, Wolff reported that she had flat affect and mood, and normal speech, thought, and perception. (Tr. 376). Johnson's attention, concentration, orientation, memory, and information were normal, and her insight and judgment were intact. (*Id.*). Wolff indicated that Johnson had concentration limitations that would present functional difficulties in a work-like setting, and that he believed that Johnson's depression would prevent her from working. (Tr. 377-78). Wolff also opined that Johnson had no limitations in understanding and memory, social interactions, and adaption. (Tr. 378).

On February 9, 2015, Wolff treated Johnson for, among other things, complaints of depression. (Tr. 432). Johnson reported her history with alcohol use. (Tr. 433). Wolff noted that Johnson's speech, behavior, thought content, judgment, cognition, and memory were normal. (Tr. 434). Although she exhibited a depressed mood, Johnson did not appear anxious, and her affect was not angry, blunt, or labile. (*Id.*). Wolff noted that Johnson's depression medication was being changed by her mental health provider and that she continued to be disabled due to her depression. (Tr. 432, 435).

**B.    Medical Opinion Evidence**

**1.    Adam Brownfeld, PhD**

On June 5, 2014, psychologist Adam Brownfeld ("Brownfeld"), PhD, conducted a consultative psychiatric evaluation of Johnson. (Tr. 381-85). Johnson's friend drove her to the evaluation, and Johnson reported that she lived with her mother and brother. (Tr. 381). She had completed high school. (*Id.*). Brownfeld reported that Johnson was extremely anxious and tearful throughout the evaluation. (*Id.*).

Johnson reported that she began experiencing psychiatric symptoms in 2010. (*Id.*). That year she was hospitalized for two days for depression. (*Id.*). Johnson noted that she had been receiving drug and alcohol treatment twice a week since February 2013. (*Id.*).

Johnson told Brownfeld that she experienced difficulty sleeping, awoke three times a night, and had nightmares "almost nightly." (*Id.*). Throughout the evaluation, Brownfeld noted that Johnson "had trembling in her voice and was stuttering." (*Id.*). Johnson reported depressive symptoms of "dysphoric mood, crying spells, loss of usual interests, diminished self-esteem, concentration difficulties, diminished sense of pleasure, and social withdrawal." (*Id.*). Johnson denied suicidal ideation, plan, or intent. (*Id.*). Johnson also

reported symptoms of anxiety, such as "excessive worrying, nightmares, muscle tension, hypervigilance, and flashbacks of abuse." (Tr. 381-82). Brownfeld noted that Johnson experienced traumatic events in 2012 and 2014 and had been assaulted. (*Id.*). Johnson reported symptoms of panic attacks, such as difficulty being around crowds of people, men, or in public places. (Tr. 382). Johnson indicated that she had stopped using the bus due to these difficulties. (*Id.*). Johnson also reported "auditory hallucinations of hearing noises approximately one to two times per week." (*Id.*). These episodes had improved with the help of Zoloft. (*Id.*). Johnson also experienced short-term memory issues. (*Id.*). Brownfeld noted that when the evaluation was complete, he "stood up to open the office door which was next to [Johnson] and she became vigilant and scared, and r[an] out of the room." (*Id.*).

Regarding her drug and alcohol history, Johnson reported that she drank alcohol occasionally and smoked marijuana once a week. (*Id.*). She was attending RMHC for rehabilitation services. (*Id.*).

During the evaluation, Johnson was cooperative and her presentation was adequate. (*Id.*). She was well-groomed, had normal posture and motor behavior, and made appropriate eye contact. (*Id.*). Her speech was fluent, clear, and adequate, except for the stuttering caused by her anxiety. (Tr. 383). Johnson's thought-process was coherent and goal oriented "with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (*Id.*). However, Brownfeld noted that her mood was dysthymic and her affect varied between depressed and anxious. (*Id.*).

As a result of Johnson's anxiety and depression, Brownfeld noted that her attention and concentration was impaired. (*Id.*). Although she was able to count and do simple calculations, she was unable to do the serial three exercises correctly. (*Id.*). Her anxiety and

depression also impaired her recent and remote memory skills. (*Id.*). Although Johnson could recall three out of three objects immediately and two out of three objects after a delay, she was unable to recall five digits forward and three digits backwards. (*Id.*). Brownfeld estimated Johnson's intellectual functioning to be below average, but her insight and judgment to be "fair." (*Id.*).

Johnson reported that she was able to dress, bathe, and groom herself, as well as cook and prepare food, clean, do laundry, and manage money on her own. (*Id.*). She did her shopping with another person due to anxiety, which also caused her to avoid public transportation. (Tr. 383-84). Her driver's license was suspended. (Tr. 383). Johnson reported that she did not have a social life or hobbies, had a difficult relationship with her family, and spent her days staying at home or going to treatment. (Tr. 384).

Brownfeld opined that there was no evidence that Johnson was limited in her ability to follow and understand simple directions and instructions, or to perform simple tasks independently. (*Id.*). According to Brownfeld, Johnson was moderately limited in her ability to maintain attention, concentration, and a regular work schedule, and to learn new tasks. (*Id.*). She was mildly limited in her ability to perform complex tasks independently and might require supervision to make appropriate decisions. (*Id.*). Brownfeld opined that Johnson was markedly limited in her ability to relate adequately with others and to deal appropriately with stress. (*Id.*). Brownfeld observed that his findings appeared "consistent with psychiatric problems" and could "significantly interfere with [Johnson's] ability to function on a daily basis." (*Id.*).

Brownfeld diagnosed Johnson with major depressive disorder, severe, with psychotic features, PTSD, panic disorder, agoraphobia, cannabis abuse, and rule out alcohol abuse. (*Id.*). He recommended that Johnson continue with drug and alcohol treatment and

individual psychological therapy. (*Id.*). Brownfeld concluded that Johnson's prognosis was "fair" and that she would not be able to manage her own funds due to her substance history. (*Id.*).

### 2. Dr. Adrian Leibovici, MD

On February 2, 2015, RMHC psychiatrist Dr. Adrian Leibovici ("Leibovici"), MD, saw Johnson for a psychiatric evaluation. (Tr. 408-10). Leibovici noted that Johnson suffered from depression and polysubstance abuse and dependence and had been followed at RMHC, "this time by [Turnipseed] with a first appointment on [October 3, 2014]." (Tr. 408). Johnson reported that she "drank to excess" two days before the evaluation "because of the Super Bowl" and felt "remorseful and tearful because of the relapse." (*Id.*).

Leibovici's mental status examination of Johnson revealed that Johnson appeared casually dressed, sullen, dysphoric, and cried at times. (Tr. 409). Johnson's affect and mood were depressed. (*Id.*). She was "somewhat hopeless and helpless about her inability to control her drinking." (*Id.*). Johnson denied daily alcohol use or symptoms of withdrawal. (*Id.*). Her thought-process was linear and logical and without illusions or hallucinations. (*Id.*). She was oriented, had good recollection of remote and recent events, and had good understanding of the information presented to her. (*Id.*). Leibovici opined that Johnson had "depressive syndrome in the context of multiple stressors, few supports, and still not entirely controlled substance use disorder." (*Id.*).

### III. Non-Medical Evidence

In her applications for benefits, Johnson reported that she was born in 1963. (Tr. 229, 242). Johnson indicated that she completed high school (Tr. 256) and had been

previously employed as a baker, a cashier/dish washer/cleaner, laundry worker, shoe sales associate, aide in a group home for children, and box maker (through a temp agency). (Tr. 279-85).

Johnson reported that she lived in a house with her family, did not care for any family or pets, and was able to care for her own personal hygiene without assistance from others. (Tr. 290-91).  She did not need help or reminders to take her medicine.  (Tr. 292).  She prepared her own meals daily and was able to clean and do laundry without help.  (Tr. 293).  Johnson reported that she went outside daily and would either walk or ride in a car for transportation (as her driver's license had been suspended).  (*Id.*).  Johnson stated that she went shopping for food or clothes once every two months.  (Tr. 294).

Johnson reported that she could pay bills, count change, and handle a savings account on her own.  (*Id.*).  Her daily hobbies included watching television.  (*Id.*).  Johnson indicated that she did not spend time with others, had problems getting along with her family and friends, and regularly attended mental health treatment twice a week.  (*Id.*).

Johnson reported that she did not have problems paying attention, was able to finish what she started, and could follow spoken and written instructions.  (Tr. 297).  She testified, however, that stress could impair her ability to think well in a work setting.  (Tr. 298).  Johnson reported that she had suffered from anxiety since she was about thirty, which was triggered by being in crowds.  (*Id.*).

At the hearing, Johnson testified about some of her former employment. (Tr. 22-23).  In addition to the temp agency, Johnson previously worked as a shoe sales associate at Marshall's.  (Tr. 23).  She was fired from that job because she walked out on her shift.  (*Id.*). She claimed that she got frustrated over the large number of shoes, the fact that the shoes "got

backed up," and because she could not take a break when she asked for one. (*Id.*). She also worked at Motel 6 for "almost a year." (Tr. 24). She was fired from that job because her new boss thought she was taking too long to clean the rooms. (Tr. 24-25). Johnson worked in a group home for children, but was fired for falling asleep on the job, which she disputed. (Tr. 25-26). She also had another job in a group home for children, from which she was laid off because of her "low seniority." (Tr. 26-27). Johnson testified that she had last worked in November 2013 at the temp agency and stopped because the agency said that it did not need her help anymore. (Tr. 22). Johnson assumed that the agency did not "really have any [more] work for us." (*Id.*). Prior to being let go, Johnson believed that her work at that job had been "good." (*Id.*).

Johnson also indicated at the hearing that she had been sober for about five to six months and attended group therapy sessions several times a week. (Tr. 36). She added that she had had a few relapses in that period of time, had drunk alcohol most recently on Thanksgiving, and had smoked marijuana in October. (Tr. 37). Johnson testified that she rode on the bus to get to her mental health treatment appointments. (Tr. 32).

Vocational Expert ("VE") Edward Pagella also testified at the hearing. (Tr. 39). Johnson's representative stipulated to the VE's qualifications as a vocational rehabilitation counselor, but not as an expert "to give numbers at th[e] hearing." (*Id.*). The ALJ accepted the VE's qualifications as a vocational expert and told Johnson's representative to let him know "if [she] ha[d] any specific objections regarding [the VE's] testimony." (Tr. 40).

The ALJ first asked the VE to characterize Johnson's previous employment. (*Id.*). According to the VE, Johnson had previously been employed as a baker, cashier/kitchen prep, laundry worker, housekeeper, recreation aide, and box maker. (*Id.*).

The ALJ then asked the VE whether a person would be able to perform any of Johnson's previous jobs who was the same age and had the same vocational experience as Johnson, had a high school education, and who could perform light work, including the ability to frequently operate hand controls with the right upper extremity, frequently reach overhead with the right upper extremity, frequently reach in other directions with the right upper extremity, frequently handle and finger bilaterally, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, and crawl, and never work around unprotected heights, and would be limited to simple, routine, repetitive tasks, and occasional interactions with supervisors, coworkers, and the general public. (Tr. 40-41). The VE testified that the individual would be able to perform the position of housekeeper. (*Id.*). The ALJ then asked the VE if he could identify other occupations in the national economy that such an individual could perform. (*Id.*). The VE identified the occupations of sorter, packer, and assembler, noting that they were "all unskilled occupations at the light level of physical tolerance." (*Id.*). The VE indicated that these jobs were "very repetitive day in, day out" and were "very simplistic" in terms of learning how to perform the jobs. (Tr. 43, 44). The VE provided an example of a "sorting" job in Rochester that required the employee simply to sort hospital gowns or towels by colors ("[t]he reds go in this pile, the whites go in this pile, the grays go in a third pile"). (Tr. 45).

The ALJ also asked the VE if he had a general opinion "as to the tolerance of off task behavior and absenteeism before employment [is] generally jeopardized." (Tr. 41-42). The VE responded that, according to the U.S. Department of Labor, an individual needs to be able to work at a "constant basis," or 84 percent of the time. (Tr. 42). The individual could not miss

more than one and one-half days of work per month.  (*Id.*).  The VE identified the Department of Labor's U.S. Census Bureau of Statistics as his source for the job numbers he identified.  (*Id.*).

## DISCUSSION

### I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

        Moreover, where a claimant's alleged disability includes mental components, at

steps two and three the ALJ must also apply the so-called "special technique." *See Kohler v.

Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). "If the claimant is found to have a medically

determinable mental impairment, the ALJ must assess the claimant's degree of resulting

limitations in four broad functional areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation." *Lynn v. Colvin*, 2017

WL 743731, *2 (W.D.N.Y. 2017) (citing 20 C.F.R. § 404.1520a(c)(3) (2016)). "If and how the

analysis proceeds from that point depends upon the degree of impairment found[;] [h]owever, the

ALJ must document his analysis, and his written decision must reflect application of the

technique, and include a specific finding as to the degree of limitation in each of the four

functional areas." *Id.* at *2 (alterations and quotations omitted) (citing *Kohler v. Astrue*, 546

F.3d at 266).

A.     **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 79-98). Under step one of the process, the ALJ found that Johnson had not engaged in substantial gainful activity since the alleged onset date. (Tr. 82). At step two, the ALJ concluded that Johnson had the severe impairments of affective disorder, anxiety disorder, obesity, degenerative disc disorder, and degenerative joint disease. (*Id.*). At step three, the ALJ further found that Johnson's mental impairments, including her substance use disorders, met sections 12.04 and 12.09 of Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings"). (Tr. 83). Specifically, in applying the required special technique, the ALJ concluded that Johnson had "hallucinations, paranoid thinking, difficulty concentrating, sleep disturbance, and thoughts of suicide." (*Id.*). Moreover, the ALJ found that Johnson had "mild restriction" in social functioning, "extreme difficulties" in social functioning, "marked difficulties" with regard to concentration, persistence or pace, and had no episodes of decompensation. (Tr. 83-84). Therefore, the ALJ found Johnson to be disabled at step three when considering Johnson's impairments and her substance use disorders. (Tr. 84).

Pursuant to the SSA's regulations regarding drug addiction or alcoholism ("DAA"), *see* 20 C.F.R. §§ 404.1535, 416.935, the ALJ considered whether Johnson's substance use was material to the disability finding. The ALJ concluded that if Johnson stopped her substance use, she would continue to have severe impairments or combination of impairments, but that those impairments, alone or in combination, would not meet or medically equal any of the impairments in the Listings. (Tr. 84-87). Specifically, the ALJ found that if Johnson stopped her substance use, she would have "mild restriction" in activities of daily living, "moderate

difficulties" in social functioning, "moderate difficulties" with regard to concentration, persistence or pace, and would experience no episodes of decompensation. (Tr. 85-86).

Next, the ALJ determined that if Johnson stopped her substance use, she would retain the Residual Functional Capacity ("RFC") to perform light work, but with both physical and non-exertional limitations. (Tr. 87). Specifically, Johnson would be able to frequently operate hand controls, reach overhead, and reach in other directions with the right upper extremity and frequently handle and finger bilaterally. (*Id.*). The ALJ also determined that Johnson was limited to occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling, and never climbing ladders, ropes, or scaffolds, and could not work around unprotected heights. (*Id.*). Furthermore, Johnson was limited to simple, routine, repetitive tasks with occasional interaction with supervisors, coworkers, and the general public. (*Id.*).

At step four, the ALJ found that Johnson had no past relevant work. (Tr. 92). At step five, the ALJ relied on the VE's testimony and found that if Johnson stopped her substance use, she could adjust to working at other jobs that exist in significant numbers in the national economy. (Tr. 93-94). Specifically, the ALJ accepted the VE's testimony that Johnson could perform the jobs of assembler (DOT # 729.687-010), sorter (DOT # 789.687-034), and packer (DOT # 559.687-074). (Tr. 92-93). Finally, the ALJ concluded that Johnson's substance use disorder was a "contributing factor material to the determination of disability because [Johnson] would not be disabled if she stopped the substance use." (Tr. 94). Accordingly, the ALJ found that Johnson was not disabled. (*Id.*).

**B.    Johnson's Contentions**

Johnson contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 10). First,

Johnson contends that the ALJ erred by failing to address Johnson's post-hearing objections concerning the VE's testimony. (Docket ## 10 at 4-13; 14 at 1-5). Second, Johnson contends that the ALJ failed to conduct the proper analysis to determine whether her substance abuse is material to the finding that she is disabled. (Docket ## 10 at 14-19; 14 at 5-7).

## II.    Analysis

### A.    Johnson's Post-Hearing Objections

I turn first to Johnson's contention that the ALJ "fail[ed] entirely" to respond to two objections raised in her post-hearing memorandum regarding the VE's testimony. (Docket # 10 at 4).[3] The first objection concerned Johnson's position that the jobs identified by the VE at the hearing – assembler, sorter, and packer – are no longer "unskilled jobs," as the VE testified, "but rather are semiskilled to skilled jobs with an SVP between 4 and 6." (*Id.* at 5, 10) (citing Tr. 321-22). Johnson based her objection on "current job information found at [the Department of Labor's] O*NET [website]," which is the Department of Labor's "current source for evaluating the requirements of jobs in the national economy." (*Id.* at 10). Johnson contends that the VE's testimony that the positions are unskilled was based on the Department of Labor's Dictionary of Occupational Titles ("DOT"), but that the DOT "is no longer the current vocational resource for the Department of Labor, Tr. 321-22; in fact, [the DOT] has not been updated <u>since 1991</u>." (*Id.*) (emphasis in original).

The second objection was based on a rebuttal vocational report by Paula Santagati ("Santagati"), submitted by Johnson in her post-hearing submission. Santagati's opinion, which

---

[3] Johnson raised other post-hearing objections (Tr. 318-23) that are not at issue here (Docket # 10 at 5 n.3) ("[p]laintiff notes that the following discussion does not include all of the objections/concerns raised by [p]laintiff's representative; however, [s]he limits [her] discussion herein to those issues raised in the post hearing memorandum which are identified as legal error herein").

does not mention Johnson specifically, asserts that any individual with a limitation of occasional interaction with coworkers and supervisors would be precluded from "all work [because] the training and probationary period for any job would require more than occasional interaction with coworkers and supervisors." (Tr. 340). In Johnson's view, Santagati's report demonstrated that the jobs identified by the VE require more than "occasional interaction" with coworkers and supervisors, contrary to the VE's testimony. (*Id.* at 5, 8-9) (citing Tr. 340-41). Johnson claims that this rebuttal evidence "directly contradicts the [VE's] opinion that [Johnson] can perform the jobs [the VE] named under the ALJ's RFC, yet the ALJ did not even *acknowledge*, no less discuss or analyze this evidence [in his decision]." (*Id.* at 9). According to Johnson, the ALJ failed in his duty to identify and "*fully resolve* conflicts in vocational evidence raised by the record." (*Id.*) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).

Johnson argues that by failing to address her objections "at all" (*id.* at 7), the ALJ did not base his determination "on all of the evidence in the case record" (*id.* at 6) (citing 42 U.S.C. § 423(A)(4)(C)). Johnson further contends that the ALJ's failure in this respect violated his obligations under Section I-2-5-55 of the Hearings, Appeals, and Litigation Law Manual ("HALLEX"). (*Id.* at 7). The version of that section in effect at the time the ALJ issued his determination provided, "If a claimant raises an objection about a VE's opinion, the ALJ must rule on the objection and discuss any ruling in the decision." HALLEX § I-2-5-55, https://web.archive.org/web/20150923080051/http://www.ssa.gov:80/OP_Home/hallex/I-02/I-2-5-55.html (last visited Aug. 17, 2018).[4] SSR 13-2p further provides that the SSA requires

---

[4] As at least one other court has noted, *see, e.g.*, *Moffit v. Berryhill*, 2018 WL 276770, *4 (D. Kan. 2018), that section has since been updated, effective June 16, 2016, by transmittal I-2-174. *See* HALLEX I-2-5-55, 1994 WL 637383. HALLEX Section I-2-6-74 now in effect addresses the testimony of a vocational expert and provides that an ALJ must "[a]sk the claimant and the representative whether they have any objection(s) to the VE testifying" and rule on any objections "on the record during the hearing, in a narrative form as a separate exhibit, or in the body of his or her decision." HALLEX § I-2-6-74, 1993 WL 751902.

adjudicators "at all levels of administrative review to follow agency policy, as set out in . . . [HALLEX]." SSR 13-2p, 2013 WL 621536 at *15.

Contrary to Johnson's position, courts routinely recognize that "HALLEX is simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner, and therefore . . . a failure to follow HALLEX does not necessarily constitute legal error." *Gallo v. Colvin*, 2016 WL 7744444, *12 (S.D.N.Y 2016) (quotations omitted), *report and recommendation adopted by*, 2017 WL 151635 (S.D.N.Y. 2017); *see also Dority v. Comm'r of Soc. Sec.*, 2015 WL 5919947, *5 (N.D.N.Y. 2015) ("[t]he Second Circuit has not yet determined whether or not HALLEX policies are binding; however, other Circuits and district courts within the Second Circuit have found that HALLEX policies are not regulations and therefore not deserving of controlling weight") (quotations omitted) (collecting cases). Johnson has not cited authority to the contrary.

In any event, a plain reading of the ALJ's decision demonstrates that the ALJ did not "fail[] entirely to respond to [p]laintiff's post-hearing objections." (Docket # 10 at 4). As the Commissioner points out, the ALJ noted in his decision both the rebuttal evidence and the objections raised by Johnson. Specifically, the ALJ stated:

> Additionally, subsequent to the hearing, additional evidence was received and admitted into the record as Exhibits 10E, 10F, 11F, and 12F. *The [ALJ] has reviewed the new evidence, and the following decision reflects all exhibited evidence as of the date of this decision.*
>
> Subsequent to the hearing, the claimant's representative objected to the vocational expert's testimony regarding the number of jobs available in the local, regional, or national economy for a lack of qualification and that the testimony was unfounded, unsupported, and unreliable. *In addition, the representative made an objection to the testimony as the jobs offered are no longer performed at the*

> unskilled level.[5]  Finally, the representative requested a
> supplemental hearing for the opportunity to address the
> aforementioned evidentiary and vocational inconsistencies
> (Exhibit 10E).  *The [ALJ] denies the objections and request for
> supplemental hearing.*  A sufficient basis for vocational expert
> testimony can be the vocational expert's professional knowledge
> and experience as well as reliance on job information available
> from various governmental and other publications, of which the
> agency takes administrative notice (see 20 C.F.R.
> §§ 404.1560(b)(2), 404.1566(d), 416.960(b)(2) and 416.966(d)).
> The regulations provide that the agency will take administrative
> notice of reliable job information available from the DOT,
> Occupational Outlook Handbook, and other reliable publications to
> determine that jobs exist in significant numbers either in the region
> where the claimant lives or in several regions of the country (20
> C.F.R. §§ 404.1566(d) and 416.966(d)).  In this case, the
> vocational expert testified that he based his answers on information
> from the U.S. Department of Labor and his professional
> experience. . . . Furthermore, [claimant's representative] did not
> raise any objections to the vocational expert when asked about
> preliminary matters [at the hearing].

(Tr. 79-80) (emphasis supplied).  The ALJ's decision makes clear that he was aware of

Johnson's post-hearing evidence and objections, but denied the objections and request for a

supplemental hearing.[6]

It is well-settled that "[a]n ALJ does not have to state on the record every reason

justifying a decision."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

As the Second Circuit recognizes, "[a]n ALJ's failure to cite specific evidence does not indicate

that such evidence was not considered."  *Id.* at 448 (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th

Cir. 1998)).  With respect to vocational expert testimony in particular, "there is no requirement

---

[5]  This language flatly refutes Johnson's contention that the ALJ "did not acknowledge or address in his decision . . . [Johnson's] object[ion] to the . . . grounds [that] the jobs identified by the [VE] . . . are no longer unskilled jobs."  (Docket # 10 at 5).

[6]  Contrary to Johnson's contention in her rebuttal brief (*see* Docket # 14 at 3), the Commissioner did not ignore her challenge based upon the rebuttal evidence.  *See* Docket # 11-1 at 19.

that [an] ALJ discuss [in his decision] his specific analysis" of a claimant's objections to vocational expert testimony. *Id.* at 448.

By contrast to the ALJ's decision at issue in *Brault*, which "did not mention [the claimant's] objection to the VE testimony" (*id.* at 448), the ALJ's decision here made clear that he considered and rejected the claimant's objections. The ALJ explicitly stated that he had "reviewed the new evidence" submitted by Johnson, which included Johnson's post-hearing memorandum and rebuttal evidence, and that his decision "reflect[ed] all exhibited evidence as of the date of th[e] decision." (Tr. 79). Based on the record, this Court rejects Johnson's contention that the ALJ was required to do more in considering and rejecting Johnson's post-hearing objections. *See id.* at 448 ("[a]ssuming the ALJ had to consider [plaintiff's] objection to the VE's testimony, we are satisfied that he did so; [t]here is no requirement that the ALJ discuss his specific analysis of it").

Moreover, to the extent that Johnson's post-hearing submission and her vocational expert statement conflicted with the testimony of the VE offered at the hearing, the ALJ did not commit legal error by accepting the VE's hearing testimony. Johnson cites SSR 00-4p for the proposition that the ALJ, when presented with Johnson's rebuttal evidence, was required to "identify and, perhaps more importantly, *fully resolve* conflicts in vocational evidence raised by the record." (Docket # 10 at 9) (emphasis in original). SSR 00-4p, however, pertains to conflicts between the VE's testimony and the DOT. SSR 00-4p provides:

> In making disability determinations, [the SSA] rel[ies] primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy. [The SSA] use[s] these publications at steps 4 and 5 of the sequential process. When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying

on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.

*Id.* at *2.  The VE's testimony accepted by the ALJ did not conflict with the DOT.

Nor did the ALJ err in crediting the VE's hearing testimony over the differing job information from O*NET.  Johnson "cites no regulation or ruling requiring that a VE's testimony be reconciled with the O*NET, nor does he cite any case in which the court reversed [the Commissioner's decision] just because the VE's testimony conflicted with the O*NET." *Ragland v. Berryhill*, 2018 WL 1757656, *11 (E.D. Wis. 2018).  "[C]ourts have rejected the notion that a VE's testimony must be consistent with the O*NET skill levels."  *Id.* at *11 n.8 (collecting cases).  As the ALJ correctly noted in ruling on Johnson's objections, the DOT, upon which the VE's testimony was based, is one of the administratively noticed sources of vocational information (Tr. 79-80); *see also* 20 C.F.R. §§ 404.1566(d), 416.966(d), and the ALJ did not err in relying on testimony based on that source.  *See*, *e.g.*, *Treadaway v. Berryhill*, 2018 WL 3862106, *6 (S.D. Tex. 2018) (rejecting contention that ALJ erred by relying on DOT rather than O*NET); *Looney v. Berryhill*, 2018 WL 3826778, *13 (E.D. Va. 2018) ("even assuming that [claimant] had validly raised the[] objections to the use of the DOT – they lack merit, because the DOT remains a valid source of job data used by the SSA"); *Thompson v. Berryhill*, 2018 WL 1568760, *2 (D. Utah 2018) ("the vocational expert did not err in using the DOT"); *Moffit v. Berryhill*, 2018 WL 276770 at *6 ("[claimant] argues that the record evidence will not support the decision reached by the Commissioner because the DOT is outdated and unreliable, and the O*NET . . . contain[s] updated and reliable information which must be used instead of the DOT information and the VE testimony[;] [t]he court does not agree").

Moreover, the VE's hearing testimony made clear that his testimony was based, not just upon the DOT and other sources he identified, but also upon his over twenty-eight years

of experience. (Tr. 42). As the ALJ correctly noted in his decision, "[a] sufficient basis for vocational expert testimony can be the vocational expert's professional knowledge and experience as well as reliance on job information available from various governmental and other publications, of which the agency takes administrative notice (see 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d), 416.960(b)(2) and 416.966(d))." (Tr. 79).

Finally, the ALJ did not err in rejecting the rebuttal vocational expert opinion that Johnson's limitation to occasional interaction with coworkers and supervisors precludes *all* work (not simply the positions identified by the VE). (Tr. 340-41). The VE testified that unskilled jobs, including those he identified that Johnson could perform, do not require significant training. (Tr. 44). The ALJ was entitled to credit the VE's hearing testimony; he did not err by rejecting the conflicting opinion offered by Santagati or by declining to hold a supplemental hearing. *See*, *e.g.*, *Treadaway v. Berryhill*, 2018 WL 3862106 at *5-6 ("Santagati's opinion is not specific to [claimant], failing to even mention her by name, and appears to be a form opinion to be used in all cases where any [claimant] has this type of limitation[;] . . . [a]t best, the ALJ was faced with conflicting opinions from two vocational experts and found [the VE who testified at the hearing] more compelling[;] . . . conflicts in the evidence are for the [ALJ] to resolve"); *Kidd v. Berryhill*, 2018 WL 3040894, *4-5 (E.D. Ky. 2018) ("[t]he ALJ had no duty to convene a second hearing to pepper the VE with questions that [claimant] could have raised initially; . . . considering the full record, [the ALJ] fairly assessed the conflicting opinions here and reasonably (if inferentially) sided with the 'qualified' VE . . . over Santagati's categorical, extreme views"); *Lara v. Berryhill*, 2017 WL 7790109, *9 (S.D. Tex. 2017) ("[a]t best, Santagati's affidavit presents evidence which conflicts with [the VE's] testimony[;] [i]t is not the [c]ourt's job to substitute its judgment for the ALJ's judgment when the record presents evidentiary conflicts;

. . . Santagati identifies no factual basis beyond her own opinion as to why every single job in America requires more than occasional interaction with others"), *report and recommendation adopted by*, 2018 WL 1027764 (S.D. Tex. 2018); *Reeves v. Berryhill*, 2017 WL 3433706, *11 (M.D. Pa. 2017) (ALJ did not err in relying on VE's hearing testimony over Santagati's opinion offered in claimant's post-hearing submission).

For these reasons, I reject Johnson's contention that remand is required on the grounds that the ALJ failed to address her post-hearing objections to the VE's hearing testimony.

**B.      The ALJ's Materiality Determination**

I turn next to Johnson's contention that the ALJ erred by failing to articulate explicitly the analysis required by SSR 13-2p, especially considering Johnson's coexistent substance use and mental disorders.  (Docket # 10 at 14-19).  Johnson interprets this regulation to mean that "a disabled claimant is entitled to benefits unless the evidence is <u>clear</u> that disability would cease absent DAA."  (*Id.* at 15) (emphasis in original).  In Johnson's view, the evidence in the record is not clear whether she would still be disabled absent her substance use, specifically because the record does not demonstrate a "period of abstinence long enough to allow the acute effects of DAA to abate."  (*Id.* at 19).  Therefore, Johnson argues, SSR 13-2p dictates that she is entitled to the "benefit of the doubt" and should be awarded benefits.  (*Id.* at 15-19).

According to the Commissioner, the ALJ was not required to expressly cite SSR 13-2p in his analysis, and SSR 13-2p, in any event, does not create a "benefit of the doubt" rule.  (Docket # 11-1 at 13).  Rather, the Commissioner argues, the burden is on the claimant "to show that her drug and alcohol use was not material" to her disability.  (*Id.*) (citing *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012), *cert. denied* 570 U.S. 919 (2013)).  Moreover, in the

Commissioner's view, the ALJ reasonably found Johnson retained the ability to work if she stopped her substance use, and thus was not disabled. (*Id.* at 13-18).

At the outset, I reject Johnson's argument that the ALJ was required to explicitly cite SSR 13-2p in his analysis. Not only has Johnson failed to cite any authority for this proposition, but other courts have rejected it. *See*, *e.g.*, *Simpson v. Berryhill*, 2018 WL 2238593, *12 (N.D. Ill. 2018) (rejecting plaintiff's argument that the ALJ erred by failing to "specifically reference SSR 13-2p"; [i]n this case, the ALJ did not err in his DAA analysis under SSR 13-2p[;] [although] the ALJ could have actually referenced SSR 13-2p and numbered the steps of his DAA analysis under SSR 13-2p, . . . his failure to do so does not mean he did not conduct a proper DAA analysis under the Regulation").

Nor has Johnson cited any authority for the contention that SSR 13-2p creates a "benefit of the doubt" rule entitling a claimant to benefits if the evidence is not clear "one way or the other" whether she would be disabled in the absence of drug or alcohol abuse. Moreover, Johnson's position is refuted by controlling Second Circuit authority that holds that it is the claimant who bears the burden of proving whether drug and alcohol abuse is material to the disability determination. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d at 123 ("we agree with the weight of the authority that claimants bear the burden of proving DAA immateriality"); *see also Davis v. Astrue*, 830 F. Supp. 2d 31, 48 (W.D. Pa. 2011) (finding that plaintiff's "benefit of the doubt" argument was a "slight misstatement of the law[;]" "the consensus among courts in [the Third] Circuit that the burden is on the claimant, not the ALJ, to establish whether DAA is or is not material to the disability determination").

I turn now to the question whether the ALJ applied the correct legal standards in determining that Johnson's substance use disorder was "a contributing factor material to the

determination of disability" (Tr. 94) and whether substantial evidence supports the decision.

Under the Act, "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor *material* to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J) (emphasis supplied). Thus, in cases such as this, where alleged nonexertional limitations include substance abuse, the inquiry "does not end with the five-step analysis." *Cage*, 692 F.3d at 123. Rather, "if the ALJ determines that a claimant is disabled, and the record contains medical evidence of substance abuse, the ALJ must proceed to determine whether the substance abuse is a contributing factor material to the determination of disability – that is, whether the claimant would still be found disabled if [s]he stopped using drugs or alcohol." *Lynn*, 2017 WL 743731 at *2 (quotations omitted); *see also Cage*, 692 F.3d at 123 ("[t]he critical question is whether [the SSA] would still find [the claimant] disabled if [she] stopped using drugs or alcohol") (citations omitted); 20 C.F.R. §§ 404.1535(a), 404.1535(b)(1), 416.935(a), 416.935(b)(1).

In making this determination, the Commissioner must evaluate which of the claimant's "current physical and mental limitations, upon which [the Commissioner] based [his] current disability determination, would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. § 404.1535(b)(2); *see also* 20 C.F.R. § 416.935(b)(2). If the Commissioner determines that the claimant's "remaining limitations would not be disabling, [the Commissioner] [must] find that [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(b)(2)(i); *see also* 20 C.F.R. § 416.935(b)(2)(i). As noted above, the claimant bears the burden of proving that drug addiction or alcoholism is not material to the disability determination, *Cage*, 692 F.3d at 123,

and "[i]f [she] fails to make this showing, and would *not* be disabled in the absence of drug and/or alcohol abuse, the ALJ [must] continue[] through the remainder of the traditional five-step analysis," *Lynn*, 2017 WL 743731 at *2.

SSR 13-2p addresses the process "for how [the Commissioner] consider[s] whether 'drug addiction and alcoholism' (DAA) is a contributing factor material to [her] determination of disability in disability claims and continuing disability reviews."  SSR 13-2p, 2013 WL 621536, *1 (Feb. 20, 2013).  Specifically, SSR 13-2p sets forth the following six-step "DAA evaluation process":

> (1) does the claimant have DAA?; (2) is the claimant disabled considering all impairments, including DAA?; (3) is DAA the only impairment?; (4) is the other impairment(s) disabling by itself while the claimant is dependent upon or abusing drugs or alcohol?; (5) does the DAA cause or affect the claimant's medically determinable impairment(s)?; and (6) would the other impairment(s) improve to the point of nondisability in the absence of DAA?

SSR 13-2p, 2013 WL 621536 at *4-6.  As the ruling indicates, the Commissioner need not continue on in the DAA evaluation process if the answer to one of the sequential questions leads to the conclusion that the claimant's DAA is material.  *See id.*; *see*, *e.g.*, *Simpson v. Berryhill*, 2018 WL 2238593 at *12 (six-step process in SSR 13-2p is sequential; "[i]f [p]laintiff cannot get past step four, no step five analysis is needed; if [p]laintiff cannot get past step five, no step six analysis is needed").  The ruling further provides that where a claimant also suffers from mental disorder, a claimant's DAA will be considered material when there is "evidence in the case record that establishes that a claimant . . . would not be disabled in the absence of DAA."  SSR 13-2p, 2013 WL 621536 at *9.

The ALJ's decision demonstrates that he complied with applicable regulations and properly analyzed Johnson's DAA, even though he did not explicitly mention SSR 13-2p,

and that his determination is supported by substantial evidence. At step two of the customary five-step process, the ALJ found that Johnson had the severe impairments of affective disorder, anxiety disorder, obesity, degenerative disc disease, and degenerative joint disease. (Tr. 82). At step three, the ALJ found that Johnson was disabled because her mental impairments, including her substance use disorder, met listings 12.04 and 12.09. (Tr. 83). Johnson does not contend that the ALJ erred to this point or that the ALJ erred in applying the so-called "special technique" in evaluating Johnson's mental impairments.

Pursuant to the regulations, the ALJ then reconsidered step two and concluded that Johnson's remaining limitations, if she stopped her substance use, amounted to a severe impairment or combination of impairments. (Tr. 84). The ALJ found, however, that in the absence of substance use, Johnson would not have an impairment or combination of impairments that met or medically equaled a Listing. (Tr. 85). This evaluation satisfied the ALJ's obligations under the sequential process described in SSR 13-2p to determine the materiality of Johnson's substance use. *See, e.g.*, *Simpson*, 2018 WL 2238593 at *13 ("Under the procedures in SSR 13-2p, the ALJ then determined that when [p]laintiff's drug and alcohol abuse was removed from consideration, he continued to have a severe impairment, but his condition no longer met or equaled any listed impairment; this satisfie[d] DAA step four. Since the ALJ's answer at step four was 'no' to whether [p]laintiff's impairments were disabling by themselves while [p]laintiff is dependent upon or abusing drugs or alcohol, under SSR 13-2p, [p]laintiff's DAA is material and the ALJ properly denied [p]laintiff's disability claim pursuant to the Regulation.").

Johnson challenges that ALJ's determination on the grounds that "the record does not contain a period of abstinence long enough to allow the acute effects of DAA to abate" and

thus does not provide substantial evidence to support the ALJ's determination that Johnson would not be disabled in the absence of her substance use. (Docket # 10 at 16). I disagree.

Johnson's treatment notes reveal several occasions on which both Bauer and Turnipseed noted improvement in Johnson's condition during periods of abstinence. For instance, Bauer referred Johnson to DAP in February 2014. (Tr. 347). At a follow-up appointments with Bauer in March and April 2014, Johnson reported that she had stopped drinking several days prior to the March 10 appointment, that she felt a reduction in her depression and anxiety, and that she had been using distractions to avoid drinking alcohol, such as crossword puzzles, watching television, and going to the gym. (Tr. 356, 355, 353). Bauer's March and April 2014 progress notes do not report any relapse. Despite a depressed and sometimes anxious mood throughout this period, as the ALJ noted, Johnson was "cooperative, demonstrated good eye contact, appropriate behavior, and calm motor activity, and exhibited logical thought processes, no hallucinations, good insight, appropriate judgment, and intact memory." (Tr. 89).

When Johnson reinitiated treatment through Behavioral Health Network on January 21, 2015, however, she reported to Turnipseed that she had been drinking the previous Sunday and admitted that she was a "different person" when she drank. (Tr. 412). Turnipseed recorded that Johnson was tearful and guarded and opined that the "course and severity of [Johnson's] symptoms [were] congruent with a diagnosis of Dysthymic Disorder and Alcohol Dependence." (Tr. 414). After another relapse in early February 2015, Johnson reported to Turnipseed on March 3 and April 2, 2015 that she had "maintained sobriety" and was ready to get better, and she appeared "noticeably happy." (Tr. 421, 420). Several months later, on

September 24, 2015, Johnson reported to Turnipseed that she had relapsed on September 21 and reported increased nightmares, flashbacks, hypersomnia, and suicidal ideation. (Tr. 450).

Although the record does not reflect that Johnson enjoyed prolonged periods of sobriety, it does reflect several periods of sustained sobriety during which Johnson generally reported decreased symptoms of depression and anxiety.[7] The record was sufficient to permit the ALJ to conclude that Johnson's substance use was material to the finding of disability, and substantial evidence supports the finding. *See Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 (2d Cir. 2018) (summary order) ("[claimant] did not demonstrate that her substance abuse was not a material factor, and substantial evidence supported the ALJ's determination that it was[;] [plaintiff's] medical records showed that her . . . functioning improved when she underwent substance abuse treatment"); *Rowe v. Colvin*, 2016 WL 5477760, *8 (N.D.N.Y. 2016) ("[t]he medical evidence also supports a finding that [claimant's] functioning improved since [claimant] abstained from alcohol, including periods of 'brief sobriety'"). *See also Cage*, 692 F.3d at 127 (substantial evidence supports determination that claimant would not be disabled were she to discontinue drug and alcohol abuse despite absence of evidence of "extended periods of sobriety").

## CONCLUSION

After a careful review of the entire record, this Court finds that the Commissioner's denial of DIB and SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above,

---

[7] Contrary to Johnson's contention, the ALJ's decision makes clear that he relied on record evidence demonstrating that she experienced periods of abstinence. (*Compare* Docket # 14 at 6 *with* Tr. 89-90). *Cf. Bukowski v. Berryhill*, 2017 WL 5789990, *4 (W.D.N.Y. 2017) ("as the Commissioner concedes, the record reveals no period of abstinence long enough to allow the acute effects of [DAA] to abate") (internal quotation omitted).

the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.

Johnson's motion for summary judgment **(Docket # 9)** is **DENIED**, and Johnson's complaint

(Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      September 7, 2018